# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| JASON GARRISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 7:17-cv-00015-LSC |
| | ) | |
| THE LINCOLN NATIONAL LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

Before the Court is Defendant, The Lincoln National Life Insurance Company's ("Lincoln") motion for summary judgment. (Doc. 20.) Plaintiff Jason Garrison ("Garrison") brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, challenging Defendant Lincoln National Life Insurance Company's ("Lincoln's") denial of his long-term disability (Count I) and denial of waiver of life insurance premiums (Count II). Defendant's motion has been fully briefed and is ripe for decision. For the reasons stated below, the Motion (doc. 20) is due to be GRANTED.

# I. BACKGROUND[1]

Garrison, a 37 year old male, was an employee of Collision Center Payroll, Inc., also known as Joe Hudson's Collision Center ("Collision Center"), as an automobile body technician. As an employee, Garrison was a participant in a welfare benefit plan funded, in part, by group insurance policies issued by Lincoln. Lincoln issued two pertinent insurance policies to the Collision Center, each with an effective date of May 1, 2014: a long-term disability ("LTD") policy, and a life insurance policy (collectively the "Policies"). *See* Administrative Record ("AR") 46, 688.

## A. *The Disability Policy*

The Disability Policy provides insurance coverage if an insured employee becomes totally or partially disabled. *See* AR 49-52. To receive a Total Disability Monthly Benefit under it, the Insured Employee must meet four qualifications:

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund,* 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .") (internal quotes omitted).

**BENEFIT.** [Lincoln] will pay a Total Disability Monthly Benefit to an Insured Employee, after the completion of the Elimination Period, if he or she:

> (1) is Totally Disabled;
>
> (2) becomes Disabled while insured for this benefit;
>
> (3) is under the Regular Care of a Physician; and
>
> (4) at his or her own expense, submits proof of continued Total Disability and Physician's care to the Company upon request.

AR 69. In order to determine whether an insured employee has met the first qualification, Lincoln looks to the definition of "Total Disability" or "Totally Disabled" in the Disability Policy:

> **TOTAL DISABILITY** or **TOTALLY DISABLED** will be defined as follows:
>
> 1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.
>
> 2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation which his or her training, education, or experience will reasonably allow.
>
> The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

AR 56 (emphasis in original). Lincoln looks to the Schedule of Benefits to determine the Elimination Period and Own Occupation Period. *See* AR 55. Thus, for the duration of the Elimination Period plus Own Occupation Period, Lincoln assesses the Insured Employee's ability to perform the Main Duties of his Own

Occupation; thereafter, the question becomes his ability to perform the Main Duties of any occupation for which he is qualified. *See* AR 56.

"Main Duties," are defined as "job tasks" that "are normally required to perform" the occupation and "could not reasonably be modified or omitted."[2] AR 54. Main Duties are defined to "include those job tasks: (1) as described in the U.S. Department of Labor Dictionary of Occupational Titles; and (2) as performed in the general labor market and national economy." *Id.* The Disability Policy specifically notes that "Main Duties are **not** limited to those specific job tasks as performed for a certain firm or at a certain work site." *Id.* (emphasis original).

The burden of proving a disability is placed on the employee. *See* AR 60 ("Proof of claim must be provided at the Insured Employee's own expense" and "must show the date the Disability began, its cause and degree."). Among other items, such proof must include "a completed statement by the attending Physician" describing the Insured Employee's medical restrictions and "any other items [Lincoln] may reasonably require." *Id.* Insured Employees are also required

---

[2] Lincoln applies "the Americans with Disabilities Act [ADA] standards concerning reasonable accommodation" "[t]o determine whether a job task could reasonably be modified or omitted." AR 54.

to provide proof of "continued Disability" within 45 days of Lincoln's request for it. *Id.*

In determining the validity of a claim, like in other administrative and interpretative functions, Lincoln is endowed with broad discretionary authority:

> **COMPANY'S DISCRETIONARY AUTHORITY.** Except for the functions that this Policy clearly reserves to the Policyholder or Employer, [Lincoln] has the authority to manage this Policy, interpret its provisions, administer claims and resolve questions arising under it. [Lincoln]'s authority includes (but is not limited to) the right to:
> (1) establish administrative procedures, determine eligibility and resolve claims questions;
> (2) determine what information [Lincoln] reasonably requires to make such decisions; and
> (3) resolve all matters when an internal claim review is requested. Any decision [Lincoln] makes, in the exercise of its authority, shall be conclusive and binding; subject to the Insured Employee's rights to request a state insurance department review or to bring legal action.

AR 62. In the event that Lincoln denies a claim, it provides written notice to the insured of the reasons for the denial, and the right to appeal. *See* AR 61. The policy includes an explicit requirement that, "[b]efore bringing a civil legal action under the federal labor law known as ERISA, . . . the plan participant or beneficiary **must** first seek **two** administrative reviews of the adverse claim decision." AR 62 (emphasis added). Garrison was an Insured Employee under the Disability Policy and was subject to a 180-day Elimination Period followed by a 24-month Own

Occupation Period. *See* AR 1, 50. Under the Policy, where all other conditions are met, Long-Term Disability Benefits for a Total Disability qualify an Insured Employee to receive 60% of his prior monthly salary, with a maximum of $6,000 per month. *See id.* Where all of the above conditions were met and Garrison showed a Total Disability, he qualified for a monthly benefit of $4,250. *See* AR 1.

B. *The Life Insurance Policy*

The Life Insurance Policy provides voluntary life insurance coverage for employees and dependents. *See* AR 692–94. Under the "EXTENSION OF DEATH BENEFIT" provision:

> Life insurance will be continued, **without payment of premiums**, for an Insured Person who:
> (1) becomes Totally Disabled while insured under this policy and before reaching age 60;
> (2) remains Totally Disabled for at least 6 months in a row; and
> (3) submits satisfactory proof within the 7th through 12th months of disability; or
>> (a) as soon as reasonably possible after that; but
>> (b) not later than the 24th month of disability, unless he or she was legally incapacitated.

AR 707 (emphasis in original). Where these qualifications are met, the Insured Employee's life insurance, and any for his dependents, will be continued in the amount that was in effect on the day the Total Disability began. *See id.* For purposes of determining eligibility for the Extension of Death Benefit, the Life

Insurance Policy defines "Total Disability or Totally Disabled" as "mean[ing] an Insured Person" who:

> (1) is unable, due to sickness or injury, to engage in **any** employment or occupation for which such Insured Person is or becomes qualified by reason of education, training, or experience; and
> (2) is not engaging in any gainful employment or occupation.

*Id.* (emphasis added). Lincoln may require "the Insured Person . . . to submit further proof of his or her continued Total Disability" at his own expense. *Id.* The "life insurance extended under this section . . . terminate[s] automatically on . . . the day the Insured Person ceases to be Totally Disabled." *Id.* Akin to the Disability Policy, the Life Insurance Policy gives Lincoln broad discretionary authority in determining whether a person is eligible for the Extension of Death Benefit, as well as other administrative and interpretative functions, by providing:

> **COMPANY'S DISCRETIONARY AUTHORITY.** Except for the functions that this Policy clearly reserves to the Group Policyholder or Employer, [Lincoln] has the authority to:
> > (1) manage this Policy and administer claims under it; and
> > (2) interpret the provisions and resolve questions arising under this Policy.
>
> [Lincoln]'s authority includes (but is not limited to) the right to:
> > (1) establish and enforce procedures for administering this Policy and administer claims under it;
> > (2) determine Employees' eligibility for insurance and entitlement to benefits;
> > (3) determine what information [Lincoln] reasonably requires to make such decisions; and

(4) resolve all matters when a claim review is requested.

Any decision [Lincoln] makes, in the exercise of its authority, shall be conclusive and binding; subject to the Insured Person's or Beneficiary's rights to:
    (1) request a state insurance department review; or
    (2) bring legal action.

*See* AR 719. If Lincoln denies the claim, it is to provide written notice of the reasons for the denial and the right to appeal. *See* AR 718. Similar to the Disability Policy, the Life Insurance Policy requires the plan participant or beneficiary to exhaust two administrative reviews before bringing an action under ERISA. *See* 719. Garrison was an Insured Person under the Life Insurance Policy and he had elected to have $100,000 in Personal Life Insurance coverage and $10,000 in Dependent coverage. *See* AR 950.

## C. *Garrison's Claim for Benefits*

Garrison worked for the Collision Center through March 20, 2015. *See* AR 621. According to his initial disability statement, he was injured on March 22, 2015, when he "bent down, [his] back snapped, and [he] fell on the floor. *Id.* He did not return to work after that date.

## D. *First Visit to Dr. Perry Savage and resulting MRI*

Two weeks after his reported injury, Garrison visited Dr. Perry L. Savage ("Dr. Savage"), an orthopedic surgeon, for "[p]ain in the lower back" that

radiated down both legs. AR 577 (April 3, 2015 examination notes). Garrison reported experiencing "moderate," "stabbing" pain "with a rating of 6/10," range-of-motion limitation, "difficulty walking," and "sleep disturbances." *Id.* Dr. Savage noted that Garrison's "symptoms have been present for [two] years" but had gotten worse over the prior six weeks; he also noted that walking, standing, and bending made the symptoms worse. *Id.* The lumbar examination revealed a limited range of motion, weak muscle strength, and decreased sensation; however, Garrison was able to walk without assistance and his lumbar alignment was normal. AR 578. Garrison's straight leg raise test was "positive bilateral," *see id.*, indicating "a slight irritation of the nerve roots," *see* AR 838. His Waddell's sign was negative, *see* AR 578, which suggested that he was not malingering and "didn't seem to have any unusual magnification of pain," *see* AR 839–40. At this first visit, Dr. Savage diagnosed Garrison with "herniated nucleus pulp/lumbar"[3] and "lumbar radiculopathy."[4] AR 578. Based on these diagnoses, the recommendation was weight loss, a home exercise plan, and a lumbar epidural injection, which Dr.

---

[3] Herniated nucleus pulp/lumbar is a spinal "disorder frequently associated with the impingement of a nerve root." 3 Soc. Sec. Law & Prac. § 42:177.

[4] Lumbar radiculopathy, refers to "a condition of nerve root compromise and irritation giving rise to radiating extremity pain frequently coupled with muscle weakness, reflex depression, and specific sensory loss." Stephen G. Brown, M.D., & Steven Plitt, The Claim Adjuster's Automobile Liability Handbook § 11:32.

Savage performed one week later. *See* AR 583. The exam notes also indicate that Garrison was "[o]ff work indefinitely." AR 578.

While Dr. Savage ordered no further nerve testing, he did order an MRI of the lumbar spine. *Id.* That MRI revealed specific issues with Garrison's spine: one "slightly wedged shape" vertebra, which appeared to be a "congenital or developmental" defect; moderate disc degeneration at one level[5] and milder degeneration at another; Schmorl's nodes[6] in three endplates; and "mild canal stenosis"[7] at one level. AR 582. Dr. Karcher, who "electronically approved" the MRI, also reported a "moderate sized right paracentral protrusion" at one of Garrison's levels and "disc bulges" at two levels. *Id.*

## E. Garrison's Application for Disability Benefits

After his first visit to Dr. Savage, Garrison submitted an application for short-term disability benefits along with an Attending Physician's Statement ("APS") completed by Dr. Savage. *See* AR 621, 607. As suggested by the April 3,

---

[5] The term "level" as used herein refers to designations such as T11-12, T12-L1, etc., which refer to the specific vertebrae in the spine. *See* Mayfield Brain & Spine, Anatomy of the Human Spine, available at https://www.mayfieldclinic.com/PE-AnatSpine.htm.

[6] Schmorl's nodes are defects in the endplates of the vertebral bone which cause degeneration and pain. *See* AR 846-47.

[7] "[C]anal stenosis is the narrowing of the spinal canal or the tunnels through which nerves and other structures communicate with that canal." Cleveland Clinic, Lumbar Canal Stenosis, available at https://my.clevelandclinic.org/health/articles/lumbar-canal-stenosis.

2015 visit, the diagnosis listed was "herniated Disc lumbar spine" and "radiculopathy lumbar." *Id.* Dr. Savage answered "Yes" to whether Garrison was "now TOTALLY disabled from PRESENT occupation" and "from ALL OTHER occupations." *Id.* He also indicated that Plaintiff could not be expected to return to employment. *Id.* Lincoln approved short-term disability benefits for Garrison on April 30, 2015, and they were ultimately extended until Garrison had received the maximum short-term benefit. *See* AR 602; 422. During this period, Lincoln did not conduct a medical review of Garrison's claim. *See* AR 20. Lincoln offered Garrison the opportunity to participate in a rehabilitation program that could assist him in finding a job or retraining for a new occupation; he opted to not participate. *See e.g.* AR 4; 549.

### F. Subsequent Visits to Dr. Savage

When Garrison saw Dr. Savage again on April 24, 2015, his pain was rated at 5/10. AR 580. Dr. Savage noted that the "[r]ecent block helped slightly" but there had been "no significant changes in the current symptoms," which were "made worse with activity, with twisting/turning, when sitting and while walking." *Id.* Additional symptoms included "difficulty walking, pain, radiation of pain on the involved side, sleep disturbances, stiffness and ROM limitation," as well as waking at night with pain. *Id.*

As with the previous examination, there was normal lumbar alignment with limited range of motion; however, Dr. Savage now reported Garrison's muscle strength and tone, sensation, and gait and station were all normal. AR 581. As before, the straight leg raise test was positive, while Waddell's signs were negative. *Id.* According to the medical records provided, Garrison returned to Dr. Savage for additional examinations on June 3, 2015; August 3, 2015; December 7, 2015[8]; February 1, 2016; and June 1, 2016. While Garrison reported that his pain worsened since his initial visit, *see* AR 568, 369 (8/10 pain rating); AR 545, 341 (7/10 pain rating); AR 874 (9/10 pain rating), the results of the lumbar examination remained largely consistent with the April 24, 2015 report. *See* AR 568–69, 545–46, 369–70, 341–42, 875.

During these visits, Dr. Savage reported discussing several treatment options with Garrison, including physical therapy, injections, and nerve blocks. *See id.* On at least three visits, surgery was discussed as an option; however, Garrison

---

[8] Dr. Savage also diagnosed Garrison with carpal tunnel syndrome on 12/7/2015. *See* AR 369–71. Although the range of motion, sensations, and reflexes were normal in both wrists, and Garrison scored 5/5 for wrist strength in all muscle groups tested, Dr. Savage reported positive Phalen's and Tinel's signs. *See* AR 370. Garrison's medical records, however, do not reveal any treatment for carpal tunnel syndrome. *See* AR 110.

consistently chose "home exercises, weight loss, and medications." *See* AR 546–47, 369–71, 342; *E.g.*, AR 568-69.

## G. Lincoln's Evaluations of Garrison's Eligibility for LTD Benefits under the Disability Policy

On October 4, 2015, Garrison reached the exhaustion limit for his short-term benefits. The month before, Lincoln gathered Garrison's medical records from Dr. Savage as well as his prior medical providers, and began a cursory review of Garrison's LTD benefit eligibility. AR 435. Without engaging in a full medical review, Lincoln approved LTD Benefits for a period beginning on September 18, 2015, based only on the records. *See* AR 390. Disability benefits would only be payable for "as long as [Garrison] remain[ed] eligible according to the terms of this [Disability P]olicy.". AR 390-91. The letter also noted that the Disability Policy limited benefits to 24 months for the condition causing Garrison's disability, referring to the Disability Policy's "Specified Injuries or Sickness Limitation." *Id*. Lincoln paid Garrison LTD benefits through May 12, 2016, at which time he was notified of their termination because he no longer met the policy definition of Total Disability. AR 324. Lincoln explained that, although Garrison had subjective complaints of pain, "[t]he medical records on file fail[ed] to provide objective findings to support restrictions and limitation of any kind beyond 03/08/2016."

AR 325. Lincoln determined the medical evidence did not support Garrison's inability to perform the Main Duties of an "Automobile Mechanic," which Lincoln had determined was his Own Occupation in the national workforce. AR 326. The letter also informed Garrison of his right to appeal the denial. *See* AR 326-27.

## H. Lincoln's Evaluations of Garrison's Eligibility for Extension of Death ("EOD") Benefits under the Life Insurance Policy

In November 2015, after approving Garrison for LTD benefits, Lincoln began reviewing Garrison's eligibility for an EOD benefit under the Life Insurance Policy. *See* AR 962. If he qualified for this benefit, his "life insurance would remain in force without payment of premiums." AR 964. Lincoln made this determination based on the same documentation provided for Garrison's disability benefits claim. *See id.* Lincoln approved the EOD benefit for 3/20/2015 through 2/27/2016. *See* AR 956–57. In the approval letter, Lincoln advised Garrison that if he "cease[d] to be Totally Disabled," the life insurance continued under this provision would "terminate automatically[;]" and also that it had sent his file for Clinical Review, to determine whether he was eligible for benefits beyond February 27, 2016. *Id.* Lincoln eventually determined that Garrison no longer met the requirements for the EOD benefit "[b]ased upon the updated medical documentation received," and informed him of such in a letter dated March 8, 2016. *See* AR 938–39. The

letter also included information regarding the appeals process. In an email on March 16, 2016, Garrison informed Lincoln that he would like to appeal "the denial of [his] death benefit." AR 937. Garrison submitted an updated APS, in which Dr. Savage classified Garrison's impairment as "severe;" and also opined that Garrison was unable to participate in any gainful employment, was not a suitable candidate for rehabilitation, and was not expected to ever be able to return to work. AR 924, 339-40. However, Dr. Savage did not believe Garrison had lost the ability to safely and completely perform any Activities of Daily Living (ADLs). *See id.* For this first appeal, Lincoln commissioned a medical review of the claim file—to which Leela Rangaswamy, M.D., a board-certified orthopedic surgeon was assigned. *See* AR 930, 671.

Dr. Rangaswamy's evaluation concluded that there was "a lack of clinical evidence to support" that Garrison was "unable to perform the material and substantial duties of his own occupation due to an orthopedic surgery condition." AR 929. Because her calls to Dr. Savage went unanswered, *see* AR 927, her assessment focused substantially on Garrison's two most recent reported physical examinations, which occurred on December 7, 2015, and February 1, 2016. *See* AR 927-29. She noted that, based on those records, the "SLR test was positive; Waddell tests were negative; Gait was normal; strength and sensation were

normal." *Id.* Dr. Rangaswamy also observed that Garrison "ha[d] nonspecific low back pain with no documentation of well-defined objective physical findings" or of "physical findings that are commensurate with specific functional limitations." *Id.* In her opinion, Garrison's "difficulties with activity of daily living" were "self-reported and nonspecific" and therefore "not clinically significant." *Id.* Based on Dr. Rangaswamy's conclusions, Lincoln informed Garrison that his appeal for EOD benefit had been denied on April 26, 2016. *See* AR 923. Like the initial letter, this one reproduced the definition of "Total Disability or Totally Disabled" as stated in the Life Insurance Policy. *See id.* It also disclosed a significant portion of Dr. Rangaswamy's review, explaining the reasons for Lincoln's conclusion that Garrison was not Totally Disabled within the meaning of the policy in addition to outlining the appeals process. *See* AR 924.

## I. Garrison retains and attorney, requests files, and files appeal for both claims decisions

Lincoln learned Garrison had retained counsel via two letters dated June 7, 2016. *See* AR 316, 920. In one letter, counsel stated that Garrison had retained the firm "in connection with Lincoln['s] denial of his [LTD] benefits," referenced the correct claim number, and asked for all copies relevant to that denial. AR 316. In the other letter, counsel stated that Garrison had retained his firm "in connection

with Lincoln['s] denial of [EOD] benefit," referenced that claim number, and made the same file request. AR 920. The file for the LTD Benefits claim, No. 1150105452, was sent on June 16, 2016, while the file for the EOD Benefit claim, No. 1150122487, followed on June 30, 2016. *See* AR 312–13, 914. On September 20, 2016, Garrison's attorney requested a "review of Lincoln's denial for [LTD] benefits dated May 12, 2016, and review of Lincoln's denial for extension of death benefit/waiver of premium dated April 26, 2012." *See* AR 911. The caption of the letter referenced both claim types and both claim numbers. *See id.*

Given that Garrison's attorney appealed the decisions together and the same medical information was at issue in both claims decisions, Lincoln evaluated the claims together. *See* AR 87–93. The administrative record reflects that in doing so, Lincoln still considered the separate definitions applicable under each Policy when evaluating the evidence. *See id.* For the first LTD benefits appeal, Lincoln evaluated whether Garrison was Totally Disabled from his Own Occupation; while for the second EOD benefits appeal, Lincoln evaluated whether he was Totally Disabled from any occupation for which he was qualified. *See* AR 87–98.

## J. Garrison's Additional Evidence

When counsel for Garrison filed the joint appeal, he supplied the following additional evidence: (1) Functional Capacity Evaluation Report ("FCE Report")

completed by Dave Bledsoe, OTR/L, C.I.R., *see* AR 819–24; (2) Medical records from the examination of Garrison performed by Dr. Savage, MD, on June 1, 2016, *see* AR 828–30; (3) Transcript of Plaintiff's counsel's examination of Dr. Savage under oath on August 25, 2016, *see* AR 831–73; and (4) Vocational Assessment from John M. Long, Jr., MS, CCM, CDMS, dated September 19, 2016, *see* AR 825–27.

The FCE Report was completed by occupational therapist ("OT") Dave Bledsoe. He reported that "[t]he psychophysical approach FCE permits patient to self-limit an activity for pain or fear of injury" and that the report would focus on "safe minimal levels of function as opposed to upper limit maximums." AR 820. Bledsoe believed Garrison capable of "light" physical demand work and opined he would "require facultative breaks from constant standing and constant sitting[;]" that his need for "lengthy durations in the supine position may impact his ability to work a full day[;]" and that "[a]ny disposition on [his] work readiness should also consider his requirement of multiple medications." *Id.*

The medical records from the June 1, 2016 visit indicated Garrison's "symptoms ha[d] worsened since the last visit[;]" but were relieved with medication. AR 828–30. The lumbar examination results were consistent with prior visits: limited range of motion, with normal lumbar alignment, muscle strength and

tone, sensation, and gait and station. AR 830. Dr. Savage noted that the x-rays showed "degenerative changes throughout L-spine" and he stated Garrison was "totally disabled and unable to [engage in] any gainful employment." *Id.* Garrison supplemented the medical records with testimony from Dr. Savage in which he recounted his initial examination of Garrison on April 3, 2015, where there was "slight nerve irritation," "very slight weakness on the right," and "slight decrease in sensation bilaterally." AR 837–38, 859. Dr. Savage opined that the conditions shown on the contemporaneous MRI "certainly can cause [Garrison's subjective] symptoms" and that "he's certainly more apt to rupture a disc in the future than someone who doesn't have this." AR 854. He noted that there is no "practical" cure or surgery for degeneration of multiple discs. *See* AR 851, 854–55. Based on his own experience in an auto body course, Dr. Savage concluded that Garrison could not perform his Own Occupation: he could not do "frequent stooping, kneeling, and crouching." AR 862. With respect to other occupations, Dr. Savage believed that a job requiring "prolonged sitting" would increase Garrison's pain level and that it was "[m]ore likely than not" that the pain would distract him from his job and cause him not to complete job tasks in a timely manner. AR 863–64.

Finally, a licensed professional counselor, John M. Long, Jr., completed a Vocational Assessment based on medical records, Dr. Savage's sworn statement,

and the FCE Report, provided by Garrison's counsel. *See* AR 826. After reviewing those findings, Mr. Long stated "I think it is important to understand that a person can have the physical capacity to work, yet still be unable to sustain competitive employment," noting the necessity of "meet[ing] both the exertional (physical) and non-exertional (non-physical) requirements of the job." AR 827. Mr. Long concluded that "it appears [Garrison] is suffering from pain which is unpredictable in nature, and which could be expected to occur more than occasionally during the workweek, making him an unreliable employee." *Id.* Based on this, Mr. Long opined that "with pain at the level reported by Mr. Garrison he plainly would be unable to meet either the exertional or non-exertional requirements of his occupation." *Id.* He therefore "agree[d] with Dr. Savage regarding Mr. Garrison's inability to work as an auto body repairman" and also found that Garrison's pain would prevent him "from maintaining the persistence, pace or work adequate attendance necessary for any other type of competitive employment." *Id.*

**K. Independent Evaluation of Garrison's Medical File**

When Garrison filed the joint appeal, Lincoln commissioned an independent medical review to evaluate whether Garrison "ha[d] any functional impairment from 03/08/2016 and forward." AR 109. This review would help Lincoln address both whether Garrison could work in his own or in any other occupation. Todd

Graham, MD, who is board-certified in Physical Medicine & Rehabilitation, completed the review. *See* AR 113, 90. Dr. Graham reviewed all medical records and summarized those that were closest to the date of review, including notes from Garrison's June 2016 visit to Dr. Savage, the June 2016 FCE Report by Mr. Bledsoe, and Dr. Savage and Mr. Long's opinions that Garrison could not return to employment. AR 109–10.

In reviewing the diagnostic x-rays and MRI, Dr. Graham stated Garrison had "relatively mild, age appropriate lumbar degenerative disc disease with small right side protrusion at L4-5, small central protrusion at L3-4, and mild canal stenosis at T11-12." AR 110. Because no nerve testing was done, Dr. Graham could not evaluate "nerve abnormalities/radiculopathy" in the spine. *Id.* He also noted that "[t]he clinical examinations d[id] not reveal any strength deficits or neurological deficits in the claimant's lower extremities/lumbar spine." *Id.* While the FCE Report "recommended light physical demand limits," Dr. Graham observed that "this evaluation did not include any validity instrument, stating that it was a 'psychophysical FCE' which 'permits claimant to self-limit activity for pain or fear of injury. . . '" *Id.* Because the findings therefore "were significantly impacted by the claimant's self-limits and perceptions," Dr. Graham concluded they could not be considered "sufficiently document[ed] as valid and reliable." AR 110–11.

As to treatment, Dr. Graham noted that Garrison did not appear to have engaged "in any physical therapy, acupuncture, additional injections . . . , chiropractic, TENS use, spinal cord stimulator trial, and/or surgery as treatments for his lumbar condition," instead electing "a home exercise program of some sort and the use of [medication]." *Id.* While "weight loss was a treatment of choice, . . . none was documented to have occurred." *Id.* Additionally, no treatment was "recommended or done" with respect to the carpal tunnel syndrome. *Id.*

Viewing the medical records as a whole, Dr. Graham concluded there was "not . . . sufficient evidence to assess any functional limits." AR 111. In Dr. Graham's opinion, "[t]he restrictions and/or limitations placed upon the claimant's physical/functional activities . . . [we]re not reasonable and consistent with the medical findings." *Id.* "Apart from [Garrison]'s perceptions, no medical evidence was noted that demonstrated anatomical or physiological abnormalities sufficiently severe to impair the claimant," other than limitations on the amount of weight he could carry. *Id.* ("lift, carry, push, pull up to 50 lbs. occasionally and up to 20 lbs. frequently"). Dr. Graham concluded Garrison was "able to work full time with the above restrictions/limitations." AR 113.

### L. Opportunity for comment on Dr. Graham's Report

On November 10, 2016, Lincoln provided Dr. Graham's report to Garrison's counsel and gave counsel 21 days to review it with Garrison and his physicians and submit any written comments or documentation to Lincoln. *See* AR 103. Lincoln stated that if it did not receive a response by December 1, 2016, it would "render a decision based on the information currently in the file." *Id.* Having received no response, Lincoln extended the response period to December 13, 2016. *See* AR 101. On December 13, 2016, Garrison's counsel informed Lincoln that he had "submitted the report of the Independent Board Certified physician to Mr. Garrison's treating physician for his review, but we have not received a response from him." AR 100. He opined that "a non-examining physician cannot assess the pain level of a claimant" and "[Lincoln] must examine a patient in order to assess their pain level." *Id.*

### M. Lincoln's Denial of the Appeals of Each Claim Decision

On December 22, 2016,[9] Lincoln informed Garrison's counsel via letter that it had completed its "review of [Garrison's] [LTD] and [EOD] benefits appeals." AR 87. The number of each claim was included at the top of the letter. *See id.*

---

[9] The letter is dated November 9, 2016, but according to Lincoln's records it was actually sent on December 22, 2016. *See* AR 40.

Lincoln provided a separate summary of the review for each claim. *See id.*, AR 93. The letter contained two distinct sections outlining the status of both the LTD benefit and the EDB. *See* AR 87-98.

### a. LTD Benefits First Appeal Decision

With respect to the LTD benefits appeal, Lincoln reproduced the definitions of "Total Disability," "Own Occupation," "Own Occupation Period," and "Main Duties or Material and Substantial Duties" from the Disability Policy. AR 87–88. Based on additional information received, Lincoln had slightly revised its classification of Garrison's profession, concluding that he was more precisely an "Automobile-Body Repairer" rather than an "Automobile Mechanic." *See* AR 88. After summarizing the initial denial decision, Lincoln provided a summary of both the first LTD appeal and also the additional evidence submitted. AR 89–90. Informing Garrison's counsel that "an Independent Physician review was completed by Dr. Todd Graham who is Board Certified in Physical Medicine & Rehabilitation," Lincoln reproduced substantial parts of Dr. Graham's opinion. AR 90–92. Based on this, Lincoln concluded that the "review of the medical documentation . . . does not support that your client was unable to perform the main duties of your client's own occupation beyond 5/12/2016." AR 92. Lincoln

ended that section with a reminder to counsel that "[his] client ha[d] exhausted [his] first level of appeal" and "may pursue a final administrative appeal." AR 93.

### b. EOD Benefit Second Appeal Decision

Thereafter, Lincoln summarized the appeal for EOD benefits. *See id.* In this section of the letter, Lincoln reproduced the definition of "Total Disability" or "Totally Disabled" from the Life Insurance Policy. AR 94. This portion summarized the initial benefits denial and the first level appeal before proceeding to the summary of the current issue, the second level appeal. *Id.* Herein, Lincoln relied on the same evaluation by Dr. Graham in denying the claim, again reproducing pertinent portions of his report. AR 95–97. Based on this information, Lincoln concluded Garrison was "not Totally Disabled from any occupation" and therefore it could not "waive [his] life insurance premiums under the [EOD] benefit provision." AR 98. In the next sentence, Lincoln noted that [Garrison's counsel] and [Garrison] ha[d] exhausted all rights of appeal, and [his] client's administrative file is now closed." *Id.*

### N. Garrison Files Suit/ Procedural Background

On January 4, 2017, Garrison filed suit alleging ERISA claims for improper denial of disability benefits (Count I) and the improper denial of a waiver of his life insurance premiums (Count II). On February 14, 2017, Lincoln filed an answer

denying liability and asserting a number of affirmative defenses, including that Garrison did not qualify for benefits under the terms of the Policy and had failed to exhaust his internal administrative remedies. (*See* Doc. 8.)

## II.    STANDARD[10]

The ERISA statute itself does not set out a standard for courts reviewing the benefits decisions of plan administrators or fiduciaries. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). Consequently, the Eleventh Circuit has developed a framework for guidance. The six-part test *Williams* used by courts when reviewing a plan administrator's benefit decision is as follows:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

---

[10] Typically, a motion for summary judgment is due to be granted upon a showing that "no genuine dispute as to any material fact" remains to be decided on the action and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). However, "'[i]n an ERISA benefit denial case[,]'" the trial court "'does not take evidence, but, rather evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary.'" *Curran v. Kemper Nat'l Servs., Inc.*, No. 04-14097, 2005 WL 894840, at *7 (11th Cir. 2005) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17–18 (1st Cir. 2002)). As the Eleventh Circuit has recognized, "the motion that serves 'as [a] vehicle[ ] for resolving conclusively' an ERISA benefits-denial action is not a typical motion for summary judgment." *Prelutsky v. Greater Ga. Life Ins. Co.*, 692 F. App'x 969, 972 n.4 (11th Cir. 2017) (citing *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 n.4 (11th Cir. 2011) (per curiam)). Therefore the standard the Court will apply in this case is the six-step framework summarized in *Blankenship*.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Alexandra H. v. Oxford Health Insurance Inc. Freedom Access Plan*, 833 F.3d 1299, 1311 (11th Cir. 2016) (citing *Blankenship v. Metropolitan Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011) (per curium)). Where the administrator "ha[s] discretion in reviewing claims under the Plan[,] . . . all of the steps . . . are potentially at issue." *Blankenship*, 644 F.3d at 1356 n.7.

## III. DISCUSSION

### A. GARRISON FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES FOR HIS LONG-TERM DISABILITY CLAIM

Though the ERISA statute itself does not include an exhaustion requirement, "[t]he law is clear in this circuit that plaintiffs in ERISA actions must exhaust available administrative remedies before suing in federal court." *Lanfear v. Home Depot, Inc.*, 536 F.3d 1217, 1223 (11th Cir. 2008) (citations omitted); *see*

*Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003); *see also Variety Children's Hosp., Inc. v. Century Med. Health Plan, Inc.*, 57 F.3d 1040, 1042 (11th Cir. 1995) ("We have repeatedly held that plaintiffs must exhaust their administrative remedies under a covered benefits plan prior to bringing an ERISA claim in federal court."). Indeed, "[c]ompelling considerations[11] exist for plaintiffs to exhaust administrative remedies prior to instituting a lawsuit." *Mason v. Cont'l Grp., Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985).

The Court has "discretion to excuse the exhaustion requirement when resort to administrative remedies would be futile or the remedy inadequate." *Counts v. Am. Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997) (citations omitted). However, because of the important policies undergirding the exhaustion requirement, it is "strictly enforce[d] . . . on plaintiffs bringing ERISA claims in federal court with certain caveats [being] reserved [only] for exceptional circumstances." *Perrino v. S. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1315 (11th Cir. 2000) ("The decision of a district court to apply or not apply the

---

[11] "Administrative claim-resolution procedures reduce the number of frivolous lawsuits under ERISA, minimize the cost of dispute resolution, enhance the plan's trustees' ability to carry out their fiduciary duties expertly and efficiently by preventing premature judicial intervention in the decisionmaking process, and allow prior fully considered actions by pension plan trustees to assist courts if the dispute is eventually litigated." *Mason v. Cont'l Grp., Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985).

exhaustion of administrative remedies requirement for ERISA claims is a highly discretionary decision which [is] review[ed] only for a *clear* abuse of discretion.") (emphasis in original).

The Disability Policy clearly required Garrison to seek two administrative reviews of the adverse claim decision before filing suit under ERISA. Garrison sought only one such review and concedes that his seeking only one review resulted in his failure to exhaust his administrative remedies as to his long-term disability claim. He contends, however, that this is a case involving exceptional circumstances such that his failure should be excused.

In his response, (doc. 24) Garrison lists three situations he avers should qualify as exceptional circumstances: (1) his attorney's confusion, (2) his filing suit before the administrative appeal deadline, and (3) Lincoln's failure to explain the basis for the failure-to-exhaust defense before that deadline had expired. The Court will address all three in turn.

First, the Court finds that the letter itself was not confusing. Garrison's attorney appealed both the LTD benefit claim and the EOD benefit claims in a consolidated letter and Lincoln in turn responded via a single letter. *See* AR 91, 911. The record indicates that Garrison's attorney understood that he was appealing two distinct claims. Lincoln's letter contained a separate, thorough review

summary for each claim, and explicitly stated whether Garrison had exhausted all administrative appeals for each respective claim. *See* AR 87–98. Notably, the LTD Benefits section clearly stated Garrison had "exhausted [his] first level of appeal" and "may pursue a final administrative appeal." Conversely, the EOD benefits section informed Garrison's counsel that "[y]ou and your client have exhausted all rights of appeal." AR 93, 98. When read in its entirety, the letter is clear and unambiguous.[12]

While the Court is sympathetic towards Plaintiff regarding his attorney's confusion and subsequent mistake, it does not find that an experienced[13] attorney's misreading of or oversight in reviewing Lincoln's denial letter qualifies as an exceptional circumstance.[14] Plaintiff has cited no binding case law, and the Court

---

[12] *See e.g. Horton v. United of Omaha Life Ins. Co.*, 244 F. Supp. 3d 1253, 1256–58, 1261–63 (N.D. Ala. 2017) (argument that letters regarding plaintiff's appeal rights for life insurance claim and LTD claim were confusing did not excuse his failure to meet the exhaustion requirement for the LTD disability claim).

[13] Plaintiff's attorney admittedly has 30 years' experience in ERISA litigation. (*See* Doc. 24 at 23.)

[14] While the Eleventh Circuit has applied the *Watts* exception to the exhaustion requirement for participants who experienced confusion regarding appeal rights, the case is inapposite here, given that it was Garrison's attorney, and not Garrison himself who experienced the confusion. *See Watts v. BellSouth Telecomms. Inc.*, 316 F.3d 1203 (11th Cir. 2003) ("It is more likely that a layperson told she 'may' exhaust her administrative remedies and that she 'may' file a lawsuit would conclude, as Watts did, that it was an either/or proposition-her option."). Additionally, the Policy here leaves no room for confusion because it clearly states that before bringing suit under ERISA, an employee "**must** <u>first</u> seek **two** administrative reviews of the adverse claim decision." AR 62.

has found none, suggesting that such an occurrence would qualify him for an exception to the exhaustion requirement.

Second, Garrison insists that filing suit well within the 180 day deadline for filing an administrative appeal should qualify as an excuse for the exhaustion of remedies requirement and be deemed and exceptional circumstance. The Court disagrees. The Disability Policy clearly states, that "**before** bringing a civil legal action under the federal law known as ERISA, an employee benefit plan participant **must** exhaust available administrative remedies." *See* AR 62 (emphasis added). Indeed, "[t]he very premise of the exhaustion requirement . . . is that the right to seek federal court review matures only after [the exhaustion] requirement has been appropriately satisfied or otherwise excused." *Springer v. Wal-Mart Assocs.' Grp. Health Plan*, 908 F.2d 897, 900 (11th Cir. 1990). Allowing Garrison's filing suit to qualify as an excuse or a substitute for the exhaustion requirement would run contrary to its essence and intent.

Third, Lincoln's alleged failure to explain the basis for the failure-to-exhaust defense does not qualify as an exceptional circumstance. The record indicates that Plaintiff had until May 8th before the 180-day appeal period ran out. Lincoln's Answer (Doc. 8) was filed February 14, 2017—more than two months prior to the appeal deadline—and explicitly listed failure to exhaust internal administrative

remedies as an affirmative defense, putting Garrison's attorney on notice. (Doc. 8.) The precise time of when Garrison requested an explanation or demand for more information from defense counsel regarding the failure-to-exhaust defense is disputed. Plaintiff takes issue with the fact that Defense counsel waited until the day the appeal period ran out to return his email. However, Defendant insists the request was not made until May 1, 2017 and a one week response time was not inappropriate. The email response, sent at 9:34 a.m. on May 8th, stated that "[n]o second appeal on the LTD claim was filed, so plaintiff failed to exhaust his administrative remedies." (Doc. 27 at 7.) The Court finds that the explicit explanation contained in the denial letter, coupled with the affirmative defense listed in the Complaint, was sufficient notice to Plaintiff's counsel, and that these circumstances do not qualify as an exceptional circumstance excusing a failure to exhaust.

In sum, under the law of this Circuit, it was incumbent upon Garrison to exhaust the administrative process for his LTD benefit claim before filing suit. Evidence in the record does not support a finding that his failure to do so may be

excused. Accordingly, summary judgment[15] is due to be granted in favor of Lincoln as to Count I.

## B. DENIAL OF CLAIMED BENEFITS

The Policies at issue here expressly grant Lincoln discretion in reviewing claims for benefits; therefore, the deferential "arbitrary and capricious" standard applies. *See* AR 62; *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 115 (1989); accord *Conkright v. Frommert*, 559 U.S. 506, 512–20 (2010); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). Under the first prong of the test, "[t]he court must consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008). "A decision is 'wrong' if . . . the court disagrees with the administrator's decision." *Id.* (internal quotation omitted).

### i. Was Lincoln's Decision Denying Benefits correct when reviewed on a *De Novo* Basis?

---

[15] Garrison insists the proper remedy for his failure to exhaust is to remand Count I to Lincoln's administrative process. While remand is the appropriate remedy for "an inadequate benefits termination letter," because the Court finds Lincoln's letter sufficient, summary judgment is appropriate. *Counts v. Am. Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997) (citations omitted).

Because an ERISA administrator must perform its duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]," the Court's review commences with an analysis of the terms of the policy itself. 29 U.S.C. § 1104(a)(1)(D). When making benefit determinations, ERISA claim administrators "need not accord extra respect to the opinions of a claimant's treating physicians," but instead may credit "independent medical opinions." *Blankenship*, 644 F.3d at 1356; *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (holding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").

The Court looks first to the Disability Policy, which requires an employee to be totally disabled to qualify for LTD benefits under the plan. AR 69. The parties agree that Garrison had some level of degenerative disc disease, but disagree as to whether this condition, at the time when his benefits were denied, rendered him unable to perform the Main Duties of his Own Occupation. The Court does not doubt that Plaintiff experiences back pain; however the question is not whether he

experiences pain, but rather, whether such pain renders him unable to work in his own[16] occupation as defined by the policy.

Pursuant to its classification system[17], Lincoln ultimately classified Garrison as an Automobile-Body repairer, which has "[r]epair[ing] damaged bodies and body parts of automotive vehicles . . . according to repair manuals, using handtools and power tools" as its main description. AR 117; *see also* AR 89. For purposes of the evaluation, an Automobile-Body Repairer is classified as a "Medium physical capacity occupation," which requires "exertion of 20 to 50 lbs. occasionally," "10 to 25 lbs. frequently," and "up to 10 lbs. constantly." AR 89; *see also* AR 118. Physical tasks which are required "frequently" include stooping, kneeling, crouching, reaching, handling, and fingering. *Id.*

It was incumbent upon Garrison to provide proof of his disabling condition. AR 60. To receive benefits, Garrison was required to provide evidence that "due to

---

[16] The policy defines "own or regular occupation" as "the occupation, trade or profession . . . in which the Insured Employee was employed with the Employer; and which was his main source of income prior to disability ." AR 55.

[17] Using information obtained from the Employer and vocational professionals and the *Dictionary of Occupational Titles*, Lincoln classifies the Insured Employee's Own Occupation. *See* AR 54, 88. Based on that classification, Lincoln identifies the "job tasks . . . normally required to perform the . . . Own Occupation," as described in the *Dictionary of Occupational Titles* and "as performed in the general labor market and national economy." AR 54. This type of classification system has been upheld as reasonable in this Circuit. *See e.g. Till v. Lincoln Nat'l Life Ins. Co.*, 678 F. App'x 805, 809 (11th Cir. 2017)(unpublished); *see also Stiltz v. Metro. Life Ins. Co.*, 244 F. App'x 260, 264 (11th Cir. 2007)(unpublished).

an Injury or Sickness," he was "unable to perform each of the Main Duties of [his] Own Occupation." AR 56. In support, he provided the opinions of three people: his treating physician, Dr. Savage, MD; an occupational therapist, Dave Bledsoe, OTR/L, C.I.R.; and a professional counselor, John M. Long, MS, CCM, CDMS. Of the three, Bledsoe was the only one to test Garrison's ability to perform tasks similar to those required of him at work. As reflected in his FCE report, Bledsoe concluded that Garrison was suited for "light" physical demands. AR 820. However, his opinion plainly does not set this as an upper limit; but instead, states that the FCE sets "safe minimal levels of function as opposed to upper limit maximums" and that Garrison could "self-limit an activity for pain or fear of injury." *Id.* According to the report, Garrison had "no apparent impairments" with respect to feeling or fingering, no restrictions on gripping, and "no limitations" on horizontal reaching. AR 821-23. He was also able to kneel, crouch, stoop, lift or carry up to 15 lbs., push up to 25 lbs., and pull up to 30 lbs. occasionally. *Id.*

In contrast to Bledsoe's findings, Garrison's treating physician, Dr. Savage, concluded he was entirely disabled from any occupation, which necessarily includes his own. However, Dr. Savage acknowledged Garrison had not lost the ability to safely and independently perform ADLs. *See* AR 339-40. Moreover,

Lincoln's reviewing physicians opined that Dr. Savage's sworn testimony is incompatible with his clinical notes. While he testified that surgery was "not practical," AR 850–51, his examination notes from at least three of Garrison's visits, including the one in February 2016, unequivocally list surgery as a treatment option, and state that Garrison elected treatment through a combination of home exercise, weight loss, and medication. *See e.g.* AR 342.

The reviewing physicians also found Mr. Long's Vocational Assessment to be insufficient in proving Garrison incapable of working in his own occupation. Beginning with the caveat that, "it is important to understand that a person can have the physical capacity to work, yet still be unable to sustain competitive employment," Long's report summarized Dr. Savage's opinions as well as the FCE results.[18] AR 826-27. The assessment of Garrison's personal ability to engage in employment and concern that he would be an "unreliable employee" who could not meet the "persistence, pace or work adequate attendance necessary" for

---

[18] When making his assessment Long considered only Garrison's medical records, Dr. Savage's sworn statement, and the FCE Report from Mr. Bledsoe. *See* AR 826.Though Garrison's counsel had received the full claim file by that time, *see* AR 914, it appears from the record that counsel did not give Mr. Long the denial letter from Lincoln or the report of Dr. Rangaswamy, the board-certified orthopedic surgeon who had reviewed Garrison's file with respect to his EOD Benefits claim. Because Long relied heavily upon the opinions of Savage, Rangaswamy's conclusion that Savage's opinions were unreasonable would have been relevant to Long's evaluation. Thus, Lincoln's choice to question the reliability of Long's conclusions was reasonable.

competitive employment is expressed in a single paragraph, which listed only one specific reason for Long's conclusion—"the pain reported by Mr. Garrison." *Id.*

Lincoln commissioned an independent medical review of Garrison's claim.[19] The board-certified reviewing physicians were Dr. Rangaswamy and Dr. Graham. Rangaswamy concluded that, "[b]ased on the medical findings, the claimant does not have impairments that would translate into functional limitations or medically appropriate restrictions from 03/08/16 and forward. There is no documentation of well-defined objective focal physical findings that are commensurate with specific functional limitations. Therefore, there is no causal relationship between the subjective complaints and any restrictions and/ or limitations." (Leela Rangaswamy, MD, Report, AR 928.) She also determined that Garrison's reports of "difficulties with activity of daily living (ADL)'s [sic] [were] self-reported and nonspecific. Therefore, they [were] not clinically significant." She found that Dr. Savage's "physical examination [did] not identify well defined objective focal

––––––––––––––––––––

[19] Lincoln's decision to do so was within its power as administrator, and it was also reasonable given the fact that Dr. Savage failed to return three of Dr. Rangaswamy's phone calls, *see* AR 927, and did not take the opportunity to respond to Dr. Graham's report that identified weaknesses in Dr. Savage's opinion, *see* AR 100. *See Sobh v. Hartford Life & Accident Ins. Co.*, 658 F. App'x 459, 465 (11th Cir. 2016)(unpublished)(noting the reasonableness of "turn[ing] to an independent physician" when a treating physician fails to respond).

findings that [were] commensurate with the need for restrictions and or limitations." AR at 929.

Todd Graham, MD[20]—who is board certified in Physical Medicine & Rehabilitation—completed a review by assessing all medical records and evidence submitted by Garrison. *See* AR 113, AR 90, AR 109-110. Observing that the x-rays and MRI revealed Garrison had "relatively mild, age appropriate lumbar degenerative disc disease with small right side protrusion at L4-5, small central protrusion at L3-4, and mild canal stenosis at T11-12," he noted that "[t]he clinical examinations d[id] not reveal any strength deficits or neurological deficits in the claimant's lower extremities/lumbar spine." AR 110. Looking at the medical records as a whole, Graham surmised it lacked "sufficient evidence to assess any functional limits," and in his opinion, "[t]he restrictions and/or limitations placed upon the claimant's physical/functional activities . . . [we]re not reasonable and consistent with the medical findings." AR 111. Indeed, "[a]part from [Garrison]'s perceptions, no medical evidence was noted that demonstrated anatomical or physiological abnormalities sufficiently severe to impair the claimant," other than some limitations on the amount of weight he could carry. *Id.* In particular, Dr.

---

[20] Dr. Graham is an independent physician, not an employee of Lincoln. *See* Doc. 20-1 at ¶ 6 (Declaration of Thomas Vargo).

Graham opined that the only method by which Garrison's functionality was assessed—the FCE—was not "valid and reliable" because it "did not include any validity instrument [and was] significantly impacted by the [Garrison's] self-limits and perceptions." *Id.* Graham ultimately concluded that Garrison was "able to work full time with [some] restrictions/limitations." AR 113.

In his Response, Plaintiff's principal argument is that Lincoln failed to properly consider his pain. However, the record indicates that both independent physicians considered all evidence submitted to them when reviewing Garrison's claim. Garrison asserts that Lincoln "should have considered Plaintiff's non-exertional limitations including those related to pain," because "[s]uch non-exertional limitations can be important aspects of vocational capacity." (Doc. 24 at 14.) Garrison cites *Rabuck v. Hartford Life and Accident Ins. Co.*, 522 F. Supp. 2d 844, 876-77 (W.D. Mich. 2007) in support of that position—which, in addition to being non-binding, does not aid him. In *Rabuck*, the medical reviewer's "utter failure" to even consider claimant's memory loss, the primary claimed disability, rendered his "opinion incredible." *Id.* at 876-77. In contrast, both reviewers here considered Garrison's pain as connected to his degenerative disc disease.

Garrison complains about the fact that "neither of [the reviewing] doctors even spoke to [him], nor examined him." (Doc. 24 at 16.) However, it is well

settled that reliance on reviewing physicians' opinions is permissible. *See Blakenship*, 664 F.3d at 1357 (citing *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008) ("[W]e find nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination . . . .") (citations and internal quotations marks omitted). The only specific reason Garrison lists for discrediting Dr. Graham's report is that his "opinions are in stark contrast to Dr. Savage's." (Doc. 24 at 17–18.) This is not a sufficient reason for discounting the opinion of a consulting physician.

Plaintiff also takes issue with the fact that Lincoln required objective evidence to prove his total disability because the policy of insurance does not explicitly require it. He cites *Creel v. Wachovia Corp.*, an unpublished Eleventh Circuit case, to support his position that Lincoln failed in its duty toward him and wrongly denied his benefits because they should not have required him to produce objective evidence. No. 08-10961, 2009 WL 179584 at *7 (11th Cir. Jan. 27, 2009) ("[A]n administrator's decision to deny benefits would be unreasonable if it failed to identify what objective evidence the claimant could have or should have produced, even if the administrator submitted the file for peer review."). *Id.* at *9. Though the insurance documents themselves do not require objective proof, it was reasonable for Lincoln to require it. *Wangenstein v. Equifax, Inc.*, 191 F. App'x 905,

913–14 (11th Cir. 2006) (when an administrator is endowed with discretion to determine what it regards as adequate proof even absent an explicit condition of objective evidence in the policy terms). In the denial letter, Lincoln clearly notified Garrison that he could submit "any additional documentation to support the appeal, such as medical treatment records, laboratory results, x-rays or other testing results." AR 93. Defendant's denial was not unreasonable for having not identified objective evidence Garrison could have or should have produced. Indeed, Lincoln clearly did so, and gave specific examples of what could be submitted to appeal his denial a second time, as required by the policy terms.

From the record, it is clear Garrison dealt with back pain for a number of years. However the evidence Garrison provided Lincoln to prove his disability claim contained discrepancies. It was therefore reasonable for Lincoln to question those inconsistencies, and instead give more credence to the conflicting conclusions of Dr. Rangaswamy and Dr. Graham, its reviewing physicians. The record does not unequivocally show that Garrison's pain rendered him completely unable to perform the duties of his own occupation[21] under the terms of the policies

_____

[21] Because the Court has determined that Lincoln did not err in its decision regarding the LTD benefit claim, which required a lower burden, the Court has no need to evaluate the correctness of Lincoln's conclusion regarding the EOD benefit claim, which required a higher burden. The

in such a way that would render him totally disabled. The Court finds that Lincoln's determination was neither wrong nor unreasonable, but was *de novo* correct. It did not err in its decision to give more credence to its own experts than it did to Garrison's treating physicians. *See Slomcenski v. Citibank, N.A.*, 432 F.3d 1271, 1279–80 (11th Cir. 2005) ("Giving more weight to the opinions of some experts than to the opinions of other experts is not an arbitrary or capricious practice."). Considering the record as a whole, we do not conclude that the administrator's decision was arbitrary and capricious. As such, summary judgment is due to be rendered in Lincoln's favor on all claims.

## IV. CONCLUSION

For the foregoing reasons, Lincoln's motion for summary judgment (Doc. 20) is due to be GRANTED for both Counts.[22] A separate order consistent with this opinion will be entered.

---

burden for the LTD benefit claim required only a showing that Garrison could not perform his *own* occupation, while the EOD benefit burden was higher, requiring a showing that he was unable to perform *any* occupation. *See* AR 56, 98. Garrison failed to make a showing of his inability to perform his *own* occupation, so it follows that he not incapable of engaging in *any* occupation. Accordingly, summary judgment is due to be granted in favor of Lincoln as to Count II as well.

[22]Accordingly, Plaintiff's request for oral argument is denied. (Doc. 24 at 24.)

**DONE** and **ORDERED** on February 22, 2018.

L. Scott Coogler
United States District Judge

190685